# IMMIGRATION & NATURALIZATION SERVICE
## EASTERN REGION
## SOUTH BURLINGTON, VERMONT



COPY

# *Vacancy Announcement*

| | |
|---|---|
| ANNOUNCEMENT NUMBER: **ER OC 98-99(NYC)** | DATE OF ISSUE: **06/22/98** <br> CLOSING DATE: ~~07/10/98~~ 7/24/98 |

**POSITION**: Immigration Inspector (Instruction) GS-1816-11

**VACANT POSITIONS**: 1 (Subject to Change)

**ORGANIZATION LOCATION**:
New York District
Adjudications Branch
Airport Section
New York, NY

**PROMOTION POTENTIAL**: NONE

**SUPERVISORY POSITION**: NO

**APPLICATION FILING ADDRESS**:
Immigration & Naturalization Service
26 Federal Plaza, Room 1105    *Robert Broulett*
New York, NY 10278

**FOR INFORMATION CONTACT**:
Name: New York Personnel
Phone: (212) 264-5951

**AREA OF CONSIDERATION**: Service-wide (Status Candidates)

**RELOCATION EXPENSES AUTHORIZED**: YES. Payment of relocation expenses will not be authorized in cases where a new appointment or a conversion, to the same or another appointing authority is involved in placing the selectee in the position; such as, those who apply for consideration under the Veterans Readjustment Appointment (VRA) Program.

**MERIT ANNOUNCEMENT AUTHORITY**: MERIT PROMOTION AND REASSIGNMENT PLAN, ADMINISTRATIVE MANUAL 2265.

Use of postage paid agency envelopes is prohibited.
APPLICATIONS RECEIVED AFTER THE CLOSING DATE WILL NOT BE CONSIDERED UNLESS TIMELY POSTMARKED.

THE IMMIGRATION & NATURALIZATION SERVICE IS AN EQUAL OPPORTUNITY EMPLOYER.

000101

GOVERNMENT EXHIBIT A

DUTIES: The incumbent is responsible for providing training to Immigration Inspector trainees and Immigration Officers detailed to perform inspections at the airport, and for providing refresher courses for journeyman Immigration Inspectors. Since Customs Officers perform Immigration primary inspections of United States Citizens, incumbent also must provide training and refresher courses to Customs Officers. Instructs and conducts classes in fields pertinent to Immigration and Naturalization Service law, immigration inspection, examination and adjudication, alien processing, naturalization, fraudulent document detection, and the organization, functions, operations and law enforcement activities of the Immigration and Naturalization Service. Maintains and improves course content continually, including methods and techniques of instruction. Prepares daily work or lesson plans for individual classroom sessions in conformance with general course outline and established learning objectives. Instructs airport personnel and District Office personnel who regularly are assigned to perform inspections on current policies, procedures and regulations regarding Immigration inspections. Within established course objectives and guidelines, maintains and ensures that specific course content is current, technically accurate, and consistent with established INS academic, operational and administrative policies. Through own initiative and originality, utilizes available training material and educational aids to promote maximum achievement of learning objectives established for the course. Makes decisions on and resolves problems involving complex phases of the laws or unusual situations requiring the interpretation and application of Service policy.

Overtime shall be in accordance with the Act of 1945 when working more than eight (8) hours in a day or when performing the above duties on a scheduled day off. The Immigration Inspector may participate in 1931 Act overtime as outlined in AM 2978.04 (6)(a).

SPECIAL ELIGIBILITY CONDITIONS: It is the policy of the Immigration and Naturalization Service to achieve a drug-free workplace. This is a testing designated position (TDP), persons selected who are not in a TDP will be required to pass a urinalysis test to screen for illegal drug use prior to final appointment. Incumbents are subject to random testing.

SELECTIVE PLACEMENT FACTOR: Knowledge of laws, regulations, and procedures concerning entry of persons to the United States and eligibility for various benefits under the immigration laws.

To be qualifying, the experience must have involved inspectional work of a comprehensive nature which employs a variety of knowledge and abilities associated with the performance of either the inspecting, examining or enforcing phases of the Immigration and Nationality Act, or a body of related laws, regulations and procedures.

CONDITIONS OF EMPLOYMENT: This position may require that the incumbent carry a firearm. Individuals selected must meet initial and continued qualifications in the use of firearms. If you have ever been convicted of a misdemeanor crime of domestic violence, it is a felony for you to possess any firearm or ammunition. Therefore, an individual with a conviction of a misdemeanor crime of domestic violence will not be eligible for the position.

## AFFIDAVIT

**STATE OF GEORGIA**

**CITY OF GLYNCO**

I, Michael C. Haggerty (white, American) Special Agent, GS-1881-9, Philadelphia Division ~~Group~~ GROUP III ALCOHOL, TOBACCO and FIREARMS ~~(Alcohol and Tobacco And Fire Arms,)~~ make the following statement freely and voluntarily to Robert Medler, who has identified himself as an EEO Contract Investigator for the Immigration and Naturalization Service (INS), investigating a complaint of discrimination by Michael C. Haggerty, knowing that this statement may be used in evidence. I understand this statement is not confidential and may be shown to any interested party. I hereby solemnly swear:

(MCH)

Q: What agency did you work for on May 19, 1999. What position did you hold? What series and grade? Who was your first line supervisor on May 19, 1999? Who was your second line supervisor as of May 19, 1999?

A: On May 19, 1999 I worked in the Immigration and Naturalization Service in John F. Kennedy Airport, the New York District. I was an inspector GS-1816-9. On May 19, 1999 my first line supervisor for Administrative

Page 1 of 9                                                                                     Initials MCH

GOVERNMENT EXHIBIT B

Purposes was (Rodrigues) Charles, he was an Supervisory Immigration Inspector. On May 19, 1999 my Second Line Supervisor was Tom Spelman. He was the Assistant Area Port Director, GS-1816-13.

[handwritten above "Rodrigues": Rodrigue]

Q: Did your supervisor know of your race and national origin? Who knew? When?

A: On May 18, 1999 my duty supervisor was David Paz he was a Supervisory Immigration Inspector. My race is white. My national origin is American. I believe that Mr. Paz knew that.

Q: Please describe the of events of May 18, 1999. What comments were made by Ms. Olmos? What did you say in response to her comments? When were these comments made? Where were these comments made? What was the context of her statements?   What behavior of Ms. Olmos do you consider harassing?

A: I hearby incorporate by reference the memorandum whose subject is entitled Racial Slur uttered by Myrna Olmos, Special Operations Inspector, JFK, dated July 7, 1999 and consisting of two pages.

She mentioned race twice during our conversation. She additionally used race in her comments to Supervisor Paz in the presence of Kevin Ho regarding this incident. She reportedly said that "all white people think they are better then everybody else."

Q: Where there any witnesses of this incident? Did you take any notes regarding this incident?

A: I believe that Kevin Ho, Carlos Ugarte, Eddie Lopez and David Paz were witnesses to these incidents. I did not take any other notes other then the memo earlier incorporated into this statement.

Q: Did you discuss the incident with others. If so who. What was said?

A: I discussed this incident with Mr. Ho that night. The next day that he contacted Ms. Hageman about this and he suggested that I talk to Ms. Hageman about this which I did. After talking with Ms. Hageman and my wife I decided to take some action over the bad remarks that Ms. Olmos said. I

Page 3 of 9                                             Initials MCM

couldn't believe what Ms. Olmos did. She went off on me on public and accused me of being a racist. It is a serious charge it is something that you can't just ignore or let role off your back.

Q: What is the procedure for reporting coworker harassment. Did you follow this procedure?

A: Mr. Paz did not seem to want to take any action. He is typical management. They do not want to know about any kind of problems. So I know from INS required training what my rights and responsibilities are under the EEO laws. So I contacted one of the EEO counselor's at the airport, Zerik Scott and since he was already handling Karen's complaint against Myrna he and contacted the EEO office, they got me the counselor from Newark, Ann Marie Wiggins. I felt that I had to go to EEO because I knew that Port Management would do nothing against Ms. Olmos. She is a particular favorite on a personal level of management. So I knew that management was not going to take any action against her. Certainly Mr. Pileggi is remarks to the EEO counselor a couple

Page 4 of 9                                        Initials  MCM

*of weeks* (MCH)

A week later vindicate my belief. He said that I violated procedures *(non)* but I did go through proper procedure by going to EEO. *They* (they) don't like that *takes the matter* because it ~~is~~ out of their hands. (MCH)

Q: When did you report this incident to Mr. Paz? What did he do? What did he say to you? What should he have done?

A: Right after Ms. Olmos' outburst she went to Mr. Paz. She talked with Mr. Paz for probably two hours. I then went over to Mr. Paz to give my side of the story and to ask what was she saying to him during that time. He responded by saying that I shouldn't have said anything to Myrna and I should know how sensitive she is. I basically said it doesn't matter how sensitive she is it was wrong how she acted. I said it was wrong what she said about Karen Hageman and Paz responded by saying that Ms. Hageman was wrong in her response to Olmos and that basically that I shouldn't have said anything to Mryna. The impression I got with Mr. Paz was that he did not want to be bothered with this incident.

Q: Have other individuals reported similar incidents to Mr. Paz. If yes, who were they, what actions were taken by management, and what is the race and national origin of these individuals? How have you been treated differently by management than those not of your race and national origin?

A: I don't think anyone has ever said anything to Mr. Paz about Ms. Olmos. They have been friends going back 10 years.

Q: Did these incidents impact on your ability to do your job? Explain your answer. Did they impact on you otherwise? Explain.

A: When you are accused of being a racist every decision that you make on the job carries the stigma that the decision was based on racism. That if management believes that you are a racist based on another officer calling you a racist they can take adverse action against you up to and including termination. In other words that if she tells this to David Paz who reports it to Mr. Charles up the chain of command I could be

investigated. Also at that time I was having my background check done for my current job at ATF. This could have at that time negatively impacted me in getting this job or any other job. If charges were filed against me for being a racist that would hurt a background investigation of me for any other job. Also I pride myself on being fair to all and to be accused of being a racist is a personal insult and furthermore when I read Ms. Olmos' response to Ms. Wiggins when Ms. Olmos claims that I called her nigger I was shocked at that and deeply hurt. I did not use racist remarks and for her to say that is not only slanderous it could have gotten me fired on the spot. Even though she says these lies management does not take any action against her.

Q:  Why do you believe your race and national origin were a factors in Mr. Paz not acting on your allegations?

A:  I believe that Mr. Paz's inaction was based on the mindset of management of not wanting to do anything in situations such as this. I think it all stems from the Port Director John Mirandona. I think that he plays favorites with the Hispanic females at the Port. If the roles were reversed and I had accused Ms. Olmos ~~implied~~ MCM

Page 7 of 9                                                    Initials MCM

of being *MCH*
(that I was) a racist and if I had further lied and claimed that Ms. Olmos used racial terms against me management would have quickly taken action me because management favors Hispanic females. I have seen from personal experience that the Hispanic females seem to get better assignments and greater chance at promotion despite abilities or lack thereof.

Q: What remedies are you requesting?

A: I want to see Ms. Olmos terminated; *MCH* she is not fit to wear the uniform of the U.S. government and I believe that the service should pay me $300,000 to compensate for the hurt and the mental anguish caused to me not only by Ms. Olmos' remarks but also for the hostile work environment created by management through (there) *their* lack of taking action against Ms. Olmos.    *MCH*

I have read this entire statement consisting of 9 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

*[Signature]*

Subscribed and sworn to before
me at Glynco, Georgia
on this 13 day of December, 1999

*[Signature] 12/14/99*
Witness